UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | CR. NO. 4:24-CR-00043 |
| v. | (Chief Judge Brann) |
| YANKUN JIANG and HANLIN YANG, Defendants | |

FILED
SCRANTON
FEB 27 2024
PER ___DJ___
DEPUTY CLERK

## INDICTMENT

THE GRAND JURY CHARGES:

### COUNT 1
18 U.S.C. § 1349
(Conspiracy to Commit Wire Fraud)

### Introduction

At times material to this Indictment:

1. The defendant, Yankun Jiang, resided in the Middle District of Pennsylvania.

2. The defendant, Hanlin Yang, resided in the Middle District of Pennsylvania.

1

## The Conspiracy

3. Beginning in or about August 2023 and continuing until February 22, 2024, in the Middle District of Pennsylvania and elsewhere, the defendants,

**YANKUN JIANG
and
HANLIN YANG,**

did knowingly, willfully and intentionally combine, conspire, confederate and agree with each other, and with other persons known and unknown to the Grand Jury, to commit wire fraud, that is to knowingly and with intent to defraud, devise and intend to devise a scheme to defraud and to obtain money from others by means of materially false and fraudulent pretenses, representations, and promises, knowing that they were false and fraudulent when made, and for the purpose of executing such scheme to defraud and to obtain money, caused the transmission of certain signs, signals, writings, pictures and sounds in interstate and foreign commerce by means of wire communications, in violation of Title 18, United States Code, Section 1343.

## Manner and Means of the Conspiracy

4. It was part of the conspiracy that members of the conspiracy, including the defendants, Yankun Jiang and Hanlin Yang, traveled throughout the Middle District of Pennsylvania, and elsewhere, in order to execute a scheme to defraud their victims, many of whom are elderly, of money and property, by means of false and fraudulent pretenses, representations, and promises.

5. It was further part of the conspiracy that members of the conspiracy would transmit an electronic communication to the home computer of a victim. The communication, often in the form of a computer screen "pop-up," was purportedly from "Microsoft" and informed the victim that the victim's computer had been "hacked." The "pop-up" provided a phone number for the victim to call.

6. It was further part of the conspiracy that upon calling the phone number, the victim would be connected to a member of the conspiracy, who provided the victim with a false narrative. Often, the member of the conspiracy falsely informed the victim that there was a

3

problem with the victim's bank account, that the victim's bank account was "not secure," and that the victim needed to transfer money from the account. Thereafter, the member of the conspiracy directed the victim to withdraw cash from the victim's bank account.

7. It was further part of the conspiracy that, during the phone calls, members of the conspiracy would continue to provide the victims with various compelling reasons, all of which were false, for the victims to make the cash withdrawals and transfers of funds. Typically, several phone calls were exchanged between members of the conspiracy and the victims.

8. It was further part of the conspiracy that members of the conspiracy, through these materially false and fraudulent pretenses, representations, and promises, thereby induced the victims to make large cash withdrawals from the victims' bank accounts.

9. It was further part of the conspiracy that, in order to conceal the crime, members of the conspiracy told the victims not to share the information related by the conspirator with anyone else.

4

10. It was further part of the conspiracy that members of the conspiracy instructed the victims to provide false information to bank tellers when making the large cash withdrawals. For instance, the victims were instructed to tell the bank tellers that the funds were being withdrawn to be used for "home remodeling."

11. It was further part of the conspiracy that members of the conspiracy told the victims that a "federal agent" or federal Marshal" would be arriving at the victims' residences to pick up the cash which the victims had withdrawn from their bank accounts. The victims were often told that the "federal agent" or "Marshal" would ensure the safekeeping of the victims' cash.

12. It was further part of the conspiracy that members of the conspiracy would provide the victims with a "code word" which the "federal agent" would later provide to the victims upon arrival at the victims' residences.

13. It was part of the conspiracy that members of the conspiracy used a number of "couriers" to pose as "federal agents" and retrieve

money, in the form of United States currency, from the victims at the victims' residences.

14. It was part of the conspiracy that members of the conspiracy utilized the "Telegram" messenger application to communicate with each other, to request information regarding the availability of the couriers to conduct the cash "pick-ups" from the victims, and to provide the victims' addresses and information to the couriers.

15. It was part of the conspiracy that members of the conspiracy, including the defendants, Yankun Jiang and Hanlin Yang, acted as couriers, traveled to the victims' residences, posed as "federal agents," provided "code words" to the victims upon arrival, and retrieved and attempted to retrieve money, in the form of United States currency, from the victims at the victims' residences, located in the Middle District of Pennsylvania and elsewhere.

16. It was part of the conspiracy that members of the conspiracy instructed the couriers to park their vehicles a distance away from the victims' residences and to then walk to the victims' residences, to help prevent the couriers' vehicles from being identified.

17. It was part of the conspiracy that members of the conspiracy, including the defendants, Yankun Jang and Hanlin Yang, communicated with each other via the "Telegram" messenger application, text messages, and phone calls, to confirm the "pick-up" of United States currency from the victims and the total amount of currency received from the victims.

18. It was part of the conspiracy that the members of the conspiracy acting as couriers delivered the United States currency obtained from the victims to the defendant, Yankun Jiang, at Jiang's residence in State College, Pennsylvania, where the currency was held for delivery to other members of the conspiracy.

19. It was part of the conspiracy that members of the conspiracy paid the couriers, including the defendants, Yankun Jiang and Hanlin Yang, for their services as couriers.

20. It was part of the conspiracy that members of the conspiracy communicated with each other, and with the victims, via phone calls, text messages, the "Telegram" messenger application, computer, and the internet, which were signs, signals, writings, pictures and sounds

transmitted in interstate and foreign commerce by means of wire communication.

21. It was further part of the conspiracy that members of the conspiracy directed victims in the Middle District of Pennsylvania and elsewhere to pay and transfer at least $316,300 though materially false and fraudulent pretenses, representations and promises.

In violation of Title 18, United States Code, Section 1349.

## FORFEITURE ALLEGATION

22. The grand jury re-alleges and incorporates by reference the allegations contained in Count One of this Indictment for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

23. The United States hereby gives notice to the defendants, Yankun Jiang and Hanlin Yang, charged in Count One of this Indictment, that upon their conviction of such offense, the United States will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section

2461(c), which require any person convicted of such offense to forfeit any property constituting or derived from proceeds obtained directly or indirectly as a result of such offense.

24. The property to be forfeited includes but is not limited to the following:

    a. $316,300 in United States currency;

25. If any of the property described above, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States of America, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of

such defendant up to the value of the forfeitable property described in this forfeiture allegation.

A TRUE BILL

GERARD M. KARAM
United States Attorney

*[signature]*       2/27/2024
ROBERT J. O'HARA       Date
Assistant United States Attorney